425 So.2d 1292 (1982)
Debra A. ORTEGO, Plaintiff-Appellant,
v.
Helen ORTEGO, and Avoyelles Trust & Savings Bank, Defendants-Appellees.
No. 82-350.
Court of Appeal of Louisiana, Third Circuit.
December 22, 1982.
Writ Denied February 23, 1983.
*1293 Preston N. Aucoin and Jules R. Ashlock, Ville Platte, for plaintiff-appellant.
Nelson M. Lee and Dan McKay and John A. Boatner, Jr., Bunkie, for defendants-appellees.
Before CULPEPPER, DOUCET and YELVERTON, JJ.
DOUCET, Judge.
Plaintiff-Appellant, Debra A. Ortego, brought suit against defendant Helen Ortego and defendant-appellee, Avoyelles Trust & Savings Bank, in tort for conversion, damages and attorney's fees. Helen Ortego answered requesting a jury trial. The bank responded with a Motion for Summary Judgment founded upon a written authorization from Debra Ortego instructing the bank to accept the signature of Helen Ortego on her checking account. The district judge ad hoc granted the summary judgment. Plaintiff appeals. We reverse and remand.
The facts giving rise to this suit occurred after the death of Steven C. Ortego, husband to the plaintiff and son of defendant, Helen Ortego. Mr. Ortego was killed in an automobile accident on October 7, 1981. Prior to his death, Steven Ortego had purchased several insurance policies, designating his wife, plaintiff herein, as beneficiary. It is the proceeds of these policies and the parties' actions relative thereto that are the subject of the present litigation.
Following her husband's death, plaintiff decided to move from Bunkie to Sulphur, Louisiana. Before she could leave, however, arrangements had to be made to settle outstanding debts. Accordingly, she paid a nocturnal visit to the home of an employee of defendant bank, Mrs. Sadie Roy, accompanied by her mother-in-law, also named defendant herein, whereat the bank employee executed a handwritten authorization which reads as follows:
*1294 
The signed authorization was subsequently filed at defendant bank. In furtherance of this authorization, several checks were signed in blank by plaintiff and left with Mrs. Helen Ortego. Mrs. Ortego, mother of decedent, was to pay off the trailer in which plaintiff and her late husband had lived.
Thereafter, checks representing proceeds of life insurance policies with decedent's wife named as beneficiary, were mailed to plaintiff in care of Mrs. Helen Ortego. Mrs. Ortego deposited these checks, two in the sum of $5,041.85 each and one for $50,000, on January 11 and 19, 1982, respectively, to the account of plaintiff. Immediately after the latter aforesaid deposit, Mrs. Helen Ortego drew a check in the sum of $50,000, payable to herself, on one of the checks signed in blank by plaintiff. Apparently, this is not what plaintiff had intended as the suit herein was filed shortly after it was discovered that the insurance proceeds had been deposited, then drained from plaintiff's account.[1]
*1295 "Defendant bank responded to plaintiff's petition with a motion for summary judgment supported by the affidavits of bank personnel, Mr. J.L. Cecil, Mrs. Sadie P. Roy, and Mr. Alfred Young. Mr. Cecil, executive vice-president and cashier, stated in an affidavit that he had personal knowledge of signature cards of Debra A. Ortego and Helen Ortego, and the written statement, dated January 7, 1982, signed by Debra Ortego, instructing the bank to accept the signature of Helen Ortego on the checking account of Debra Ortego. Additionally, he examined the following documents and ascribed their signature to plaintiff:
1) Aetna Life & Casualty Company Draft No. 1789624087 payable to Debra A. Ortego in the amount of $5,041.85 dated December 3, 1981;
2) Aetna Life & Casualty Company Draft No. 1789624086 payable to Debra A. Ortego in the amount of $5,041.85 dated December 3, 1981;
3) `Deposit Ticket' on account of Debra A. Ortego evidencing deposit of Aetna Life & Casualty Company Draft Nos. *1296 XXXXXXXXXX and XXXXXXXXXX in the aggregate sum of $10,083.70 to the account of Debra A. Ortego dated January 11, 1982, which was signed by the said Debra A. Ortego;
4) Avoyelles Trust & Savings Bank Check No. 153 drawn against the account of Debra A. Ortego dated Jan. 11, 1982, payable to the order of Helen Ortego in the amount of $10,083.70 which was signed by the said Debra A. Ortego as maker;
5) INA Draft No. LG 03316481 payable to Debra A. Ortego, c/o Helen Ortego in the amount of $50,000.00 dated Jan. 11, 1982;
6) `Deposit Ticket' on account of Debra A. Ortego evidencing deposit of INA Draft No. LG 03316481 in the sum of $50,000.00 to the account of Debra A. Ortego dated Jan. 19, 1982, which was signed by the said Debra A. Ortego; and
7) Avoyelles Trust & Savings Bank Check No. 154 drawn against the account of Debra A. Ortego dated Jan. 19, 1982, payable to the order of Helen Ortego in the amount of $50,000.00 which was signed by the said Debra A. Ortego as maker."
Cecil considered all signatures to be genuine. His affidavit further states that, in view of facts known to him, the bank at all times acted in good faith and in accordance with its reasonable standards and policies and the intent of plaintiff was to allow such transactions. Affiant also stated his knowledge of LSA-R.S. 10:3-401 through 10:3-407, relative to completion of unauthorized completion of documents, and that the negligence of plaintiff in signing blank checks to Helen Ortego "contributed substantially to the material alterations thereof and/or unauthorized use thereof by Helen Ortego." His affidavit concludes that plaintiff is precluded as a matter of law from asserting her claim against Avoyelles Trust and Savings Bank.
Sadie Roy's affidavit recalls the Ortegos' nocturnal visit to her house on January 7, 1982 whereat she executed the handwritten authorization allowing Helen Ortego to sign on the checking account of Debra Ortego and that Debra Ortego signed the instrument. She further recalls Debra Ortego delivering an unknown quantity of checks, signed in blank to her mother-in-law, while the two were still at her house and her response expressing the dangers of same. Mrs. Roy filed the authorization upon going to work the next day.
Mr. Young's affidavit recounted Helen Ortego transacting banking business on behalf of her son both before and after his death and specifically recalled her depositing checks involved herein.
Subsequent to her petition and the filing of the affidavits hereinabove, plaintiff filed an affidavit wherein she reasserted the limited scope of Helen Ortego's authority and that she had no intention of granting her permission to deal with the insurance proceeds involved. Plaintiff further asserted that she had established a new account in Sulphur where she would have cashed the insurance checks which she was to receive. According to her affidavit Helen Ortego's authority, as expressed at the nocturnal visit with Mrs. Roy, was limited to drawing on the account for the limited purpose of paying off remaining bills and did not extend to depositing checks to her account. Plaintiff maintained that the power of Helen Ortego to write checks was confined to the bank account as it was on January 7, 1982. Plaintiff further averred that "Avoyelles Trust and Savings Bank, with absolutely no authority from anyone, permitted Helen Ortego to endorse affiant's check, deposit it to affiant's account, and use one of the presigned checks affiant had given her to draw out the $50,000 and deposit the same to Helen Ortego's account." Although not of direct relevance, we note in this regard that Helen Ortego's answer claims the insurance proceeds were intended as gifts.
A motion for summary judgment should be granted only if the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits show no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. C.C.P. Art. 966. *1297 Papers supporting the position of the party moving for summary judgment are to be closely scrutinized, while the opposing papers are to be indulgently treated. Vermilion Corp. v. Vaughn, 397 So.2d 490 (La. 1981). A summary judgment is not appropriate when it is based upon affidavits and accompanying pleadings and other documentary evidence to establish subjective facts such as motive, intent, good faith or knowledge. Mecom v. Mobil Oil Corp., 299 So.2d 380 (La.App. 3rd Cir.1974), Fontenot v. Aetna Insurance Co., 225 So.2d 648 (La. App. 3rd Cir.1969). Only when reasonable minds must inevitably concur is a summary judgment warranted and any doubts should be resolved in favor of a trial on the merits. Cates v. Beauregard Elect. Coop. Inc., 328 So.2d 367 (La.1976); Kay v. Carter, 243 La. 1095, 150 So.2d 27 (1963); Clement v. Taylor, 382 So.2d 231 (La.App. 3rd Cir.1980). Nor is summary judgment appropriate as a vehicle for the disposition of a case, the ultimate decision in which will be based on opinion evidence or the judicial determination of subjective facts. Butler v. Travelers Ins. Co., 233 So.2d 271 (La.App. 1st Cir. 1970); Smith v. Preferred Risk Mutual Ins. Co., 185 So.2d 857 (La.App. 3rd Cir.1966).
Sections of the Uniform Commercial Code applicable to the case are set forth in Title 10 of La. Revised Statutes, as follows:
§ 3-115. Incomplete instruments
(1) When a paper whose contents at the time of signing show that it is intended to become an instrument is signed while still incomplete in any necessary respect it cannot be enforced until completed, but when it is completed in accordance with authority given it is effective as completed.
(2) If the completion is unauthorized the rules as to material alteration apply, even though the paper was not delivered by the maker or drawer; but the burden of establishing that any completion is unauthorized is on the party so asserting. Added by Acts 1974, No. 92, § 1, eff. Jan. 1, 1975.
§ 3-406. Negligence contributing to alteration or unauthorized signature
Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.
Added by Acts 1974, No. 92, § 1, eff. Jan. 1, 1975.
§ 3-407. Alteration
(1) Any alteration of an instrument is material which changes the contract of any party thereto in any respect, including any such change in
(a) the number or relations of the parties; or
(b) an incomplete instrument, by completing it otherwise than as authorized; or
(c) the writing as signed, by adding to it or by removing any part of it.
(2) As against any person other than a subsequent holder in due course
(a) alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense;
(b) no other alteration discharges any party and the instrument may be enforced according to its original tenor, or as to incomplete instruments according to the authority given.
(3) A subsequent holder in due course may in all cases enforce the instrument according to its original tenor, and when an incomplete instrument has been completed, he may enforce it as completed. Added by Acts 1974, No. 92, § 1, eff. Jan. 1, 1975.
There can be no serious dispute but that a genuine issue of material fact exists as to whether the completion of the instruments was authorized and that resolution of this issue in favor of plaintiff would *1298 render the alteration material.[2] Thus the question becomes whether plaintiff is precluded from asserting the alteration against defendant bank. We find that a genuine issue of material fact exists as to whether appellee acted in accordance with reasonable commercial standards when it allowed withdrawal of funds totaling thousands of dollars from the account of another, which funds immediately prior thereto had been deposited by one who was not the named payee. Questions exist as to why the check had been channeled through plaintiff's account, then withdrawn, instead of being directly cashed. Although the bank maintains its actions were in good faith, summary judgment is not the appropriate vehicle for resolution of subjective facts such as good faith. Mecom v. Mobil Oil Corp., supra, Fontenot v. Aetna Insurance Co., supra.
The same can be said of appellee's assertion that the intent of plaintiff was to provide unrestricted authority to Mrs. Ortego. In light of the questionable nocturnal meeting whereat a bank employee wrote out an authorization of unspecified scope, we entertain doubts as to what plaintiff's intentions were. Genuine issues of material fact exist as to whether Mrs. Roy's actions were in accord with reasonable commercial standards and the intended scope of plaintiff's grant of authority.
Banks are entrusted with huge sums of money, therefore they are held to the high standard of care imposed upon fiduciaries. Plaintiff is entitled to her day in court to determine whether defendant bank met that standard of care. Whether or not plaintiff is likely to prevail on the merits is irrelevant to our review.
Our research has revealed no Louisiana jurisprudence on point, however, such is not necessary for our resolution of the issue presented. Nevertheless, we note that upon remand, resort to jurisprudence of other states is entirely proper as the purpose of the U.C.C. is, of course, to promote uniformity in commercial transactions among the different jurisdictions. Pargas, Inc. v. Estate of Taylor, 416 So.2d 1358 (La.App. 3rd Cir.1982).
For the reasons assigned hereinabove, the judgment appealed is reversed and the case is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
NOTES
[1] The pertinent allegations of plaintiff's petition are as follows:

"2.
"The late STEVEN C. ORTEGO, resident of Avoyelles Parish, Louisiana, made the plaintiff, DEBRA A. ORTEGO, the beneficiary of several insurance policies. On October 7, 1981, the said Steven C. Ortego was killed in a highway accident.
"3.
"About a month later plaintiff received the payment of one of his policies in the amount of FORTY THOUSAND AND NO/100 ($40,000.00) DOLLARS. Plaintiff then opened an account at AVOYELLES TRUST AND SAVINGS BANK, henceforth referred to as AVOYELLES TRUST. She had bank checks printed so that she could draw against this account.
"4.
"The plaintiff, pathetically naive and abysmally ignorant in the field of financial affairs, on December 2nd, 1981, issued a check for TWELVE THOUSAND FIVE HUNDRED FORTY SEVEN AND 76/100 ($12,547.76) DOLLARS to pay for the balance due on a trailer bought by herself and her deceased husband. The payee of this check was HELEN ORTEGO, who was supposed to see that the trailer was paid out.
"5.
"From this point on, relations between plaintiff and HELEN ORTEGO, the mother of her husband, rapidly deteriorated. Plaintiff was threatened with being sent to the penitentiary for bigamy if she uttered any protest, or "made trouble" for HELEN ORTEGO. From that time to this, the threats of HELEN ORTEGO have terrified the plaintiff.
"6.
"Plaintiff then decided to leave Bunkie, but before doing so permanently she and HELEN ORTEGO one night went to the home of a Mrs. Roy, an employee of AVOYELLES TRUST and a friend of HELEN ORTEGO, where some sort of document was drawn up empowering HELEN ORTEGO to draw on plaintiff's account for the payment of any outstanding bills that might have been incurred by herself and her dead husband. For this purpose plaintiff left with HELEN ORTEGO some of her checks signed in blank. Following this financial arrangement, plaintiff departed from Avoyelles Parish.
"7.
"On or about January 11, 1982, an insurance check for TEN THOUSAND EIGHTY THREE AND 70/100 ($10,083.70) DOLLARS made out to DEBRA H. ORTEGO, arrived, posted in care of HELEN ORTEGO. HELEN ORTEGO never advised plaintiff of this check's arrival, but took it to AVOYELLES TRUST where she was permitted to endorse and deposit it to the account of DEBRA A. ORTEGO. Lending itself to be used for the conversion, AVOYELLES TRUST permitted HELEN ORTEGO to endorse plaintiffs check, deposit it to the plaintiff's account and then let HELEN ORTEGO use one of the plaintiff's checks, signed in blank, to withdraw the money and deposit the TEN THOUSAND EIGHTY THREE AND 70/100 ($10,083.70) DOLLARS to the account of HELEN ORTEGO. The bank knew of no claim which HELEN ORTEGO had on the funds of the plaintiff.
"8.
"On or about January 20th, 1982, another check for FIFTY THOUSAND AND NO/100 ($50,000.00) DOLLARS from INSURANCE COMPANY OF NORTH AMERICA, made out to DEBRA A. ORTEGO, addressed to the plaintiff in care of HELEN ORTEGO, was delivered through the post to HELEN ORTEGO at 603 South Matthew, Bunkie, Louisiana.
"9.
"HELEN ORTEGO never advised plaintiff that such a check had been received. Instead she took it to AVOYELLES TRUST where she was again permitted to endorse the check without any authority to do so and deposit it to the account of plaintiff. AVOYELLES TRUST was grossly negligent to have permitted this to happen. Even more unbelievable was AVOYELLES TRUST simultaneously permitting HELEN ORTEGO, using one of the signed checks left by her by plaintiff, to then draw the entire FIFTY THOUSAND AND NO/100 ($50,000.00) DOLLARS out of the plaintiff's account and deposit it in her own. AVOYELLES TRUST permitted HELEN ORTEGO to take plaintiffs money as though it were hers by some act of donation. As a matter of fact, AVOYELLES TRUST took upon itself to act as the instrument for bringing about this nefarious conversion.
"10.
"Plaintiff knew that she was to have received the FIFTY THOUSAND AND NO/100 ($50,000.00) DOLLARS and TEN THOUSAND EIGHTY THREE AND 70/100 ($10,083.70) DOLLARS payments on the policies. When she later inquired of HELEN ORTEGO whether these had been sent to her, this inquiry was met with ferocious hostility and threats of sending her to the penitentiary if she persisted in trying to obtain her money. Plaintiff is in mortal dread of her mother-in-law."
[2] Bank employee, Mr. Cecil, himself acknowledged in affidavit that there were material alterations and/or unauthorized use.