609 So.2d 965 (1992)
William ARMSTEAD, Jr., and His Wife Debra Frank Armstead
v.
BOH BROS. CONSTRUCTION CO., INC., T.L. James & Company, Inc., Federal Steel Erection Company, Inc., DMJM-Curtis and Davis, and the State of Louisiana.
No. 91-CA-2614.
Court of Appeal of Louisiana, Fourth Circuit.
November 24, 1992.
Alvin G. Baham, Baham, Curet, Kronlage & Pastor, Gretna, for plaintiffs-appellants William Armstead, Jr. et al.
H.F. Foster, III, Bienvenu, Foster, Ryan & O'Bannon, New Orleans, for defendants-appellees Boh Bros. Const. Co., Inc., et al.
Before KLEES, BYRNES and WALTZER, JJ.
KLEES, Judge.
Plaintiff, William Armstead, Jr. (Armstead), appeals the district court's dismissal of his suit against defendants, Boh Bros. Construction Co., Inc. (Boh Bros.) and T.L. James & Company (T.L. James), on a motion for summary judgment. After a review of the record and applicable law, we affirm.
Armstead was employed by Federal Steel Erection Company, Inc. (Federal Steel Erection) as an iron worker for the construction of the New Orleans Mississippi River Bridge approaches to New Orleans. On October 2, 1986 Armstead was working *966 on a piling approximately 50 feet above ground. While descending the piling, the wooden frame on which he was climbing broke off, causing him to fall to a platform constructed below. Upon landing on the platform, Armstead struck a safety railing which also gave way, causing him to fall to the ground and suffer serious injuries. Armstead filed suit against Federal Steel Erection, Boh Bros., and T.L. James, DMJM-Curtis and Davis, and the Department of Transportation and Development, State of Louisiana (DOTD) alleging negligence and in intentional tort by "said employer."
On November 6, 1986, Boh Bros. and T.L. James filed a motion for summary judgment. In response to this motion, Armstead filed a first amending petition specifically alleging intentional torts by the other defendants, in addition to the "said employer." On September 20, 1991, after an indefinite continuance, the motion for summary judgment was heard. Upon finding that there is no dispute of material fact and that the law and evidence are in favor of the movers, the trial court granted summary judgment. It is from this judgment that Armstead has perfected his appeal.
Armstead argues that the trial court erred in granting the defendants' motion because there are issues of material fact as to the question of the defendants' intent and whether the defendants knew that his injuries were substantially certain to result from the inadequacy of the safety rail.
In order for the plaintiffs to remove themselves from the scheme of the Louisiana's Worker's Compensation Act, they must prove that the injury resulted from an "intentional act." LSA-R.S. 23:1032(B). The Louisiana Supreme Court, in Bazley v. Tortorich, 397 So.2d 475 (La.1981), gave definition to the term "intentional act" as used in the above mentioned statute:
The meaning of "intent" is that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that the result is substantially certain to follow from his conduct.

Id. at 481.
To meet the Bazley test, the plaintiff must plead a specific intentional tort. Dycus v. Martin Marietta Corp., 568 So.2d 592 (La.App. 4th Cir.1990); Caudle v. Betts, 512 So.2d 389 (La.1987). The Dycus court in light of Caudle concluded the "substantially certain" test is not an alternative to proving intent, but would be applied only to acts classified as traditional intentional torts such as battery, assault, false imprisonment, etc. Dycus at 594.
The issue here is whether the defendants' actions were intentional acts which fall under the exception to the compensation act. In the instant case, Armstead indicates that the defendants may have failed to provide the plaintiff with a safe place to work and therefore may be negligent. However, as illustrated in Hood v. South Louis Medical Center, 517 So.2d 469 (La.App. 1st Cir.1987), failure to maintain safe conditions in the workplace may give rise to conditions "which, at most, could be said to have made the occurrence of an accident likely, but the circumstances fall short of indicating that injury to plaintiff was inevitable or substantially certain to occur." Id. at 471.
Armstead's allegations that the defendants acted in such a manner that rose to the level of an intentional tort and that injury was substantially certain to follow are insufficient to substantiate any "intent" as established by law, but rather raise the question of negligence. Because of the exclusive provision of the worker's compensation statute, the defendants' negligence is not a material issue. Under Louisiana law, a motion for summary judgment is the proper procedure for the defendant-employers to object to an employee's general allegations that injuries resulted from an intentional tort. Mayer v. Valentine Sugars, Inc., 444 So.2d 618 (La.1984). Accordingly, for the foregoing reasons summary judgment was properly granted and the trial court is affirmed.
AFFIRMED.
WALTZER, J., dissents with reasons.
*967 WALTZER, Judge, dissenting with written reasons.
This appeal is from a September 23, 1991 judgment of the Civil District Court for the Parish of Orleans, the Honorable Louis A. DiRosa, Judge presiding, granting defendants' motion for summary judgment. Plaintiff appeals that judgment.
Plaintiff was employed by Federal Steel Erection Company, Inc. (hereinafter Federal Steel Erection) as an iron worker during the construction of the New Orleans Mississippi River Bridge approaches to the city of New Orleans. On October 2, 1986 plaintiff was working atop a piling approximately 50 feet above ground. Plaintiff commenced his descent to the ground. While descending, the wooden frame on which plaintiff was climbing broke and gave way, causing plaintiff to fall to a platform constructed below. Upon landing on the platform, plaintiff struck the safety railing which also broke and gave way, resulting in plaintiff falling to the ground. Plaintiff has suffered serious injuries. Plaintiff sued Federal Steel Erection, Boh Bros. Construction Co., Inc. (Boh Bros.), T.L. James & Company, Inc. (T.L. James), DMJM-Curtis and Davis, and the Department of Transportation and Development, State of Louisiana (hereinafter DOTD).
On October 2, 1986 plaintiff filed his petition alleging negligence and an intentional tort by "said employer". On November 3, 1986 Boh Bros. filed an answer. Defendant's Boh Bros. and T.L. James filed a motion for summary judgment on November 6, 1986. Hearing on the November 6 motion was set for November 21, 1986. On November 19, 1986, plaintiff filed a first amending petition alleging intentional torts by the other defendants. At the hearing on November 21, the motion was continued indefinitely. Five years later on September 11, 1991, the hearing was again continued until September 20, 1991 when presumably a hearing was held. The trial court rendered the following judgment:
"This cause came on (sic) for hearing on the Motion for Summary Judgment filed in (sic) behalf of Boh Bros. Construction, Co., Inc. and T.L. James & Company, Inc., individually and as a joint venture, on Friday, September 20, 1991.
THE COURT, after hearing the evidence and argument of counsel, being of the opinion that there is no dispute of material fact and that the law and evidence are in favor of movers, for the reasons orally assigned.
IT IS ORDERED, ADJUDGED AND DECREED that the Motion for Summary Judgment be granted, and according (sic), the suit of plaintiffs, William Armstead, Jr. and his wife, Debra Frank Armstead, be and the same is hereby dismissed, with prejudice, and at their cost, as against Boh Bros. Construction, Co., Inc. and T.L. James & Co., Inc., individually and as a joint venture."
No written reasons for judgment were provided and although the judgment states that there were oral reasons assigned, there is no transcript of the hearing contained in the record.
On appeal, plaintiff-appellant raises only one specification of error, namely that the trial judge erred in granting the motion for summary judgment.
C.C.P. Art. 966 B. provides in part:
"... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law."
As is evident from C.C.P. art. 966 cited above, the likelihood of ultimate success at trial is not the test for summary judgment.
Summary judgment is not favored and any doubt is resolved against the granting thereof and in favor of trial on the merits to resolve disputed facts. Ortego v. Ortego, 425 So.2d 1292 (La.App. 3rd, 1982), writ denied 429 So.2d 147 (La., 1983) appeal after remand 471 So.2d 1106 (La.App. 3rd, 1985).
The majority states that "the issue is whether the defendants' actions were intentional acts which fall under the (intentional tort) exception to the compensation act" *968 and proceeds to conclude that they are not intentional acts on the basis of the pleadings. I disagree and would find that the defendants actions were intentional acts.
This writer cannot help but remember other cases in which middle and uppermanagement testified that when the dollar cost of plant or product or working condition safety were weighted by the company against the dollar cost of a worker's compensation premium, a management decision was made not to invest in safety in order to prevent the deaths of two or three of their employees because workmen's compensation premiums were less costly than investing in safety.
The Pinto cases revealed that Ford Motor Company knew for years that their failure to include a $15 piece of sheet metal potentially would result in thousands of their customers dying in horribly painful fire deaths per year. Was this management decision an intentional tort? Would a reasonable man in the defendant's position believe the deaths of its customers was substantially certain to follow as a result of its decision to avoid implementation of an inexpensive safety feature? Yes, even their own research department studies said so. Not only were their customers not warned about this situation, but Ford sought to suppress the information. It was by the so called "hot documents", the internal documents, studies, and memos obtained in the course of discovery that this "management decision" was proven in the Pinto case.
The asbestosis cases indicated to us that the asbestos manufacturers had known from as early as the 1890's to as late as the 1920's that inadequate safety procedures would result in the long term deaths of their employees. The employees were not only not warned of this danger, but once again the asbestos industry suppressed the information for 70 to 100 years. It was documentary evidence that indicated that asbestos manufacturers, not once, but repeatedly made the choice to slowly kill its employees rather than make the choice to take safety precautions. Would a reasonable man in the position of the asbestos manufacturers believe that it was substantially certain that their employees were going to die? Once again their own documentary evidence indicated so.
The tobacco cases indicated similar patterns of behavior by the industry.
Finally, there is the upriver chemical plant vice-president who testified in a trial transcript reviewed by this court stated that rather than provide safety equipment and procedures, the company made the choice to "lose" two or three workers a year because the worker's compensation premium is cheaper. Do his workers know that 2 to 3 of their number per year are expected to die? Shouldn't they be told so they can decide if they want to change their employment or seek higher pay for working in hazardous conditions?
These types of cases were proven by the depositions and "hot documents" procured through discovery. They were paper cases where R & D studies were discovered, corporate archives were examined and internal memos were produced. If summary judgment had been granted in those cases, then the plaintiffs never would have had the opportunity to find out if there had been such management decisions and they never would have had a trial at which this evidence could have been brought forth.
This writer believes that those types of serious, studied, well-thought out, conscious, "management decisions" are intentional acts. The corporation via its actors, management, clearly intends for a percentage of its employees to die or suffer grave bodily harm as a result of its omission. The corporation via its actors, management, clearly intends to make the choice that it makes and clearly intends the harm that is substantially certain to follow.
This writer believes that intentional acts which are the result of management decisions to avoid their responsibility to provide a reasonably safe work place are intentional torts.
The writer realizes that this is a minority position, but believes that there has been a line of cases that have misinterpreted our law, discussed below.
*969 LSA-R.S. 23:1032, as amended by Act 147 of 1976, in pertinent part, provides:
"The rights and remedies herein granted to an employee ... on account of an injury ..., shall be exclusive of all other rights and remedies ... against his employer, or any principal or any officer, director, stockholder, partner or employee of such employer or principal ... Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act. (emphasis added).
In Bazley v. Tortorich, 397 So.2d 475, 480 (La., 1981) the court stated:
"After considering broader penalties that would have provided double benefits for an employer's violation of a safety rule, failure to provide a safety device required by law, or gross negligence on the part of a supervisory employee, which caused injury, death, or disease,... our legislature chose to impose a sanction for intentional wrongs by making the exclusive remedy rule inapplicable to such acts." (emphasis added).
A clear and uncomplicated reading of the above quoted sentence indicates that the court intended that "an employer's violation of a safety rule, failure to provide a safety device required by law, or gross negligence on the part of a supervisory employee" are "such acts" and "intentional wrongs" for which the exclusive remedy rule is inapplicable. It is obvious that the court found these three situations to be intentional acts and intentional torts. This reading is consistent with the rest of the Bazley holding, as will be discussed below, but several court of appeal cases have held that "an employer's violation of a safety rule, failure to provide a safety device required by law, or gross negligence on the part of a supervisory employee" are not intentional torts or intentional wrongs. Thus the appellate courts improperly applied the exclusive remedy rule in those cases.
In Bazley, supra, the court further stated:
"Because of the general practice of severely punishing intentional wrongdoers, which is widely accepted in the field of workers' compensation, because of the received meaning and acceptance of the statutory language, and considering the object of the legislation, we conclude that the words `intentional act' mean the same as `intentional tort' in reference to civil liability.
In drawing a line between intentional and unintentional acts we believe the legislative aim was to make use of the well established division between intentional torts and negligence in common law. See W. Prosser, Law of Torts, §§ 7, et seq. (4th ed. 1971)."
Also on page 480, the Bazley court states:
"There is definite tendency to impose greater responsibility upon a defendant whose conduct has been intended to do harm, or morally wrong." (emphasis added).
A review of W. Prosser, Law of Torts §§ 7, et seq. (4th ed. 1971) yields some interesting results. According to Prosser, traditional intentional torts include intentional interference with the person and intentional interference with property, including among others, trespass, assault, false imprisonment, transferred intent, trespass to land, trespass to chattels, infliction of mental disturbance or mental distress including fright and humiliation, apprehension of the infliction of a tort, nuisance, invasion of the right to privacy, trespass de bonis asportatis or abuse of power, trespass to chattels, trover, defamation, and conversion which includes destruction or alteration. Prosser further states:
"The intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do any harm. Rather it is an intent to bring about a result which will invade the interest of another in a way that the law will not sanction. The defendant may be liable although he has meant nothing more than a goodnatured practical joke, or has honestly *970 believed that he would not injure the plaintiff, or even where he was seeking the plaintiff's own good ... Intent, however, is broader than a desire to bring about physical results. It must extend not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what he does. An anarchist who throws a bomb into the royal carriage may actually wish to kill no one but the king; but since he knows that the death of others in the carriage is a necessary and almost inevitable incident to that end, and nevertheless goes ahead with the deed, it must be said that he intends to kill them. The man who fires a bullet into a dense crowd may fervently pray that he will hit no one, but since he must believe and know that he cannot avoid doing so, he intends it. The practical application of this principle has meant that where a reasonable man in the defendants position would believe that a particular result was substantially certain to follow, he will be dealt with... as though he had intended it." (page 32) (emphasis added).
A review of Harper, James & Gray, The Law of Torts Vols. 1 & 2 (2nd Ed., 1986) indicates the following are traditional intentional torts: interference with the possession and use of land, interference with chattels, interference with the person, malicious prosecution and abuse of process, defamation, disparagement of title and quality of property including slander of title, trade libel, the economic loss and business torts including inducing breach of contract, intentional interference with performance of contract, interference with reasonable economic expectations, unfair competition including unfair appropriation, boycott and arbitrary refusals to deal, deceit including misrepresentation, non-disclosure, and concealment, trespass vi et armis including per quod servitium amsit, alienation of affections, conversion including conversion of person, loss of companionship, society and services, loss of service of a person, seduction, abduction, intentional infliction of emotional disturbances including emotional distress, and abusive language, invasion of privacy, including intentional interference with an interest in seclusion, intentional interference with an interest in personal dignity and self-respect, intentional interference with an interest in privacy of name, likeness and life history, and intentional interference with an interest in sentimental associations.
In addition to the named intentional torts, both Prosser and Harper, James & Gray indicate that there exist numerous other traditional intentional torts for which no particular name has been developed, but which are nonetheless traditional intentional torts:
"No catchword or name is in general use to describe the situation in which the defendant makes false statements or by conduct creates a false impression that is neither disparaging nor defamatory but which, because of the action of third persons, causes harm to prospective advantageous economic relations of the plaintiff. There seems, nevertheless, to be a definite social policy that may be expressed in general rules of law to govern such situations, as well as others affecting economic interests of the victims of such falsehoods. Bowen, L.J., in Ratcliffe v. Evans, declared that `an action will lie for written or oral falsehoods, not actionable per se, or even defamatory, when they are maliciously published and when they are calculated in the ordinary course of things to produce, and when they do produce, actual damage.'" (pages 294-6).
The majority opinion states:
"To meet the Bazley test, the plaintiff must plead a specific intentional tort. Dycus v. Martin Marietta Corp., 568 So.2d 592 (La.App. 4th Cir.1990); Caudle v. Betts, 512 So.2d 389 (La.1987). The Dycus court in light of Caudle concluded the "substantially certain" test is not an alternative to proving intent, but would be applied only to acts classified as traditional intentional torts such as battery, assault, false imprisonment, etc. Dycus at 594."
In Caudle v. Betts, supra, the Supreme Court stated at page 391:

*971 "In Bazley this court briefly explained the difference between an intentional tort and a negligent act but did not profess to set forth a complete exposition of either branch of tort law. Intentional tort law encompasses far more than could be explicated reasonably in a single opinion. (citations omitted) Consequently, when an employee seeks to recover from his employer for an intentional tort, a court must apply the legal precepts of general tort law related to the particular intentional tort alleged in order to determine whether he has proved his cause of action and damages recoverable thereunder."

As discussed above, not all traditional intentional torts have a specific name, but they are nonetheless traditional intentional torts. Our law holds that no one can be compelled to undertake a vain and useless act. Where an employee sues on an intentional tort which does not have a specific name, it would be a vain and useless act to require him to name a nameless thing. This court in Dycus, supra, read the above underlined language to mean that an intentional tort must be specifically plead by a specific name for that tort. Upon researching the Dycus case, one quickly realizes that every case which cites Dycus either questions it or criticizes it. There does not even exist among all panels of this court an agreement as to Dycus. See: Concurrence by Barry, J., Wallace v. Kaiser Aluminum & Chem. Corp., 578 So.2d 206 (La. App. 4th, 1991) and Williams v. Gervais F. Favrot Co., Inc., 573 So.2d 533 (La.App. 4th, 1991).
The writer believes that Dycus erroneously interpreted the above underlined language of Caudle to mean that in all future cases it is required that a specifically named intentional tort must be alleged. The writer interprets the above underlined language in Caudle to be a reference to and a statement of fact that in this particular case a specific intentional tort was pled which triggered certain methods of interpretation by the court. Accordingly, the writer examined the original petition in Caudle v. Betts, supra. The original petition in Caudle, supra provided:
"4.
Defendant, Peter Betts, then and there committed an intentional battery on the plaintiff by administering an electrical shock to the back of his neck in the area of his right occipital nerve ..."
Thus the original petition in Caudle did in fact allege a particularly named tort as well as a statement that it was an intentional tort. Thus the writer believes the above underlined language in Caudle was a statement of the facts of the Caudle case and not a statement of a pleading requirement for future cases. This interpretation is especially valid because Caudle would then be in line with the long standing Louisiana jurisprudence that:
"The system of fact pleading prevails in Louisiana. Under this system, pleading is the `handmaid rather than the mistress' of justice. Unduly harsh or technical rules of pleading are not favored. Each pleading must be reasonably construed so as to afford the litigant his day in court, arrive at the truth, and do substantial justice. West v. Ray, 210 La. 25, 26 So.2d 221; Seale v. Stephens, 210 La. 1068, 29 So.2d 65; Florida Molasses Co. v. Berger, 220 La. 31, 55 So.2d 771; Breaux v. Laird, 230 La. 221, 88 So.2d 33."

Erath Sugar Company v. Broussard, 240 La. 949, 125 So.2d 776, 777 (La.1961).
This interpretation would also place Caudle in line with C.C.P. Art. 856 which provides in part:
"... Malice, intent, knowledge, and other condition of mind of a person may be alleged generally."
If the erroneous holding in Dycus were to be followed, however, then the writer believes that it would be sufficient for an employee to allege in his petition that he does "hereby specifically plead any and all denominated and undenominated intentional torts implicit in the facts recited herein." This language would give the employer notice to prepare a defense to an intentional tort suit and would avoid the "unduly harsh and technical rules of pleading" which are repudiated by our law.
Lastly, the writer believes that the holding in the Second Circuit case, Regan v. *972 Olinkraft, 408 So.2d 937, 940 (La.App. 2nd, 1981) writ denied 412 So.2d 1095 (La., 1982) that "substantially certain" means "virtually sure" or "nearly inevitable" is erroneous. There exist differences in degree, nuances and shades of meaning in words that are distinguishable. It is not enough to pull a list of synonyms from a thesaurus or dictionary and declare all of the words to be equal. Among the many roles of judges and lawyers is that of wordsmiths hammering out the nuances and meaning of words. While this writer agrees that "certain" and "sure" are words of equal dignity and degree, the word "inevitable" is of a much greater degree than "certain" or "sure". Likewise, the word "substantially" is of a lesser degree than the word "virtually". Accordingly, the phrase "substantially certain" is less than "virtually certain" or "nearly inevitable". There is no need to define "substantially certain" by some other words; "substantially certain" means "substantially certain" no more and no less.
In conclusion, I would find that the petition states the traditional intentional tort of private nuisance, that questions of material fact exist, that in the suit's present posture, it is impossible to determine if defendants would be entitled to judgment as a matter of law and would reverse the grant of summary judgment.